441 S.E.2d 376

**Camilla M. BOYLE, Plaintiff Below, Appellant,**

v.

**Robert E. BOYLE, Defendant Below, Appellee.**

**No. 21657.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 1994.

Decided Feb. 18, 1994.

---

Jolyon W. McCamic, McCamic & McCamic, Wheeling, for appellant.

Richard W. Gladstone, II, Joseph M. Ramirez, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, Larry A. Winter, Spilman, Thomas, Battle & Klostermeyer, Charleston, for appellee.

PER CURIAM:

This action is before this Court upon an appeal from the December 15, 1992, order of the Circuit Court of Ohio County, West Virginia. On appeal, the appellant, Camilla M. Boyle, asks that this Court reverse the order of the circuit court. In arriving at the equi-

table distribution of the marital stock, which consisted of 241,935 shares of ORALCO, Inc. (hereinafter "ORALCO") common stock, the circuit court awarded the appellant 29,273 shares of the stock. The circuit court further awarded the appellant one-half payment of her attorney's fees. The appellant now specifically asks that this Court find that she be entitled to half of the marital stock or 120,967.5 shares of stock and that she be reimbursed for the remaining one-half of the outstanding attorney's fees. For the reasons stated below, the decision of the circuit court is reversed.

## I

The parties were married on February 10, 1962. Four children were born of the marriage, all of whom are now emancipated. Throughout the parties' marriage, the appellant was a housewife. The appellee, Robert E. Boyle, was an engineer. For the majority of the marriage, the appellee worked for Kaiser Aluminum with the Boyle family living in various cities throughout the country during this state of the appellee's career.

In April of 1983, the appellee left Kaiser Aluminum and became the president of Ormet Corporation (hereinafter "Ormet"). Ormet was losing millions of dollars when the appellee became the company's new president. The company was in threat of bankruptcy.

In September of 1986, the appellee acquired 1,500,000 shares of common stock in Ohio River Associates Inc. (hereinafter "ORA"), the parent company of Ormet. The ultimate chain of ownership of the companies is as follows: ORALCO holds and owns the common stock of ORA which in turn owns the common stock of Ormet. Nevertheless, this redeeming and purchasing[1] of stock and the reorganization of ORA led to the leverage buy out[2] of Ormet. It was during the redemption and reorganization of ORA that the appellee exchanged his 1,500,000 shares of ORA stock for 241,935 shares of ORALCO stock. This acquisition of stock by the appellee occurred during the parties marriage, and therefore the marital stock in question consists of 241,935 shares of ORALCO common stock.

On November 5, 1987, the appellant instituted this action by filing a complaint seeking a divorce from the appellee. On November 11, 1987, the parties separated.

It was following the parties' separation that the value of ORALCO's stock increased most dramatically. More specifically, the stock increased in value from $66.55 per share to $275 per share.[3] However, the company's belated success created problems in terms of distribution of the parties' assets during the divorce proceedings.

Both parties submitted expert testimony supporting their proposed method of valuation and distribution of the stock. The parties stipulated that November, 1987, the month that the action was commenced and the month that the parties separated, would serve as the date of valuation of the ORALCO stock. The appellant's expert, Mr. Louis Paone, valued the marital stock at $42.6 million. However, the family law master did not find Mr. Paone's calculation to be reliable in that the family law master believed that Mr. Paone's calculations were influenced by unforeseeable events that occurred after November, 1987. Mr. Farrell Rubinstein, the appellee's expert, valued the marital stock at $13.8 million. The family law master concluded that the marital stock was worth $16.1 million. The family law master arrived at this conclusion in that he found Mr. Rubinstein's report to be a more accurate valuation

1. The redemption of stock is equivalent to repurchasing the stock.

2. A leverage buy out occurs when a group or corporation acquires another corporation that has a small amount of equity and a large amount of debt.

3. The transcript illustrates that in August of 1991, an agreement was drawn up between the appellee and former owners of ORALCO stipulating to the fact that the agreed price of an ORALCO share would be $275. The family law master noted in his findings of fact and conclusions of law that because ORALCO is a closely held corporation, this appears to be the only indication of a "per" share value for the stock. As explained in note 4 this is the value of the stock at the date of the parties' separation, November, 1987, and therefore, this was the value utilized by the family law master in calculating the distribution of the stock.

of the stock. Therefore, the family law master took Mr. Rubinstein's figure of $13.8 million and added $2.3 million, which reflected the December, 1987, nonrecurring extraordinary gain that was found to be foreseeable.

On June 10, 1992, the family law master filed his ultimate findings of facts and conclusions of law with the circuit court. The following is a summary of the more pertinent recommendations of the family law master:

> the appellee is to transfer to the appellant 29,273 shares of ORALCO common stock, at a value of $275 per share, for a total worth of $8.05 million subject to later redemption by Mr. Boyle at the price of $275 per share; [4]

> the appellee is to pay the appellant $128,477 equaling one-half of the $256,953 after tax proceeds on the February, 1989, $300,000 dividend which includes interest thereon at 10% through December 31, 1991;

> the appellee is to transfer to the appellant one-half of the $135,000 IRA rollover pension account presently in the appellee's name;

> the appellee is to pay the appellant $6,000 per month for alimony, however, upon a minimum redemption or purchase of 25% of the appellant's stock, any and all alimony shall cease;

> the appellee shall contribute one-half towards the attorney fee statement of Mrs. Boyle's attorney.

By order dated December 15, 1992, the circuit court adopted the recommended decision of the family law master and granted the parties a divorce. It is from the December 15, 1992, order of the circuit court that the appellant appeals to this Court.

## II

The primary issue before us is the appellant's contention that the circuit court erred in failing to award the appellant one-half of the marital stock, or 120,967.5 shares of OR-ALCO stock, in the equitable distribution of the marital property.

The doctrine of equitable distribution has evolved into the premier method of disbursing marital property in divorce proceedings among various states. West Virginia was a forerunner in the evolution and implementation of this doctrine within the realm of domestic relations law. In the landmark case of *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312 (1983), this Court adopted the doctrine of equitable distribution of marital property upon divorce. *See also* 41 A.L.R.4th 445. It was this case that led the West Virginia State Legislature to amend the existing domestic relations chapter of the *West Virginia Code* and to enact new laws and statutes recognizing the doctrine of equitable distribution.

The marital property disposition statute is *W.Va.Code*, 48-2-32 [1984], which sets forth the manner and method of distribution. This statute states in relevant part, that, "[e]xcept as otherwise provided in this section, upon every judgment of annulment, divorce or separation, the court shall divide the marital property of the parties equally between the parties." *W.Va.Code*, 48-2-32(a) [1984]. The statute reiterates this concept, but provides four exceptions to this general rule in *W.Va.Code*, 48-2-32(c)(1-4) [1984]:

> (c) In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:

> (1) The extent to which each party has contributed to the acquisition, preservation and maintenance, or increase in value of marital property by monetary contributions ...

> ....

> (2) The extent to which each party has contributed to the acquisition, preservation

---

**4.** As the record reflects, the family law master arrived at this award by dividing $16.1 million, his valuation of the stock, by 2 which equals $8.05 million. Next, in order to determine the number of shares of stock the appellant was to receive, the family law master divided $8.05 million by $275, the price per share as of November, 1987, for a total of 29,273 shares. This amount, 29,273, gives the appellant 6% of the marital stock.

and maintenance, or increase in value of marital property by non-monetary contributions ...

    . . . .

(3) The extent to which each party expended his or her efforts during the marriage in a manner which limited or decreased such party's income-earning ability or increased the income-earning ability of the other party ...

    . . . .

(4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties: Provided, That except for a consideration of the economic consequences of conduct as provided for in this subdivision, fault or marital misconduct shall not be considered by the court in determining the proper distribution of marital property.

This Court later implemented this subsection of the equitable distribution statute in *Somerville v. Somerville,* 179 W.Va. 386, 369 S.E.2d 459 (1988). In that case, the lower court awarded the wife/appellant, Jean D. Somerville, only 30% of the marital property, and the court failed to offer any explanation as to why she was denied the statutory presumption of equal division of the parties' property. This Court found that the trial court abused its discretion by awarding the appellant less than 50% of the marital property without articulating a reason for the unequal division, and thus, in support of this finding we held in syllabus point 1 of *Somerville, supra:*

In the absence of a valid agreement, the trial court in a divorce case shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to fault, based on consideration of certain statutorily enumerated factors, including: (1) monetary contributions to marital property such as employment income, other earnings, and funds which were separate property; (2) non-monetary contributions to marital property, such as homemaker services, child care services, labor performed without compensation, labor performed in the actual maintenance or improvement of tangible marital property, or labor performed in the management or investment of assets which are marital property; (3) the effect of the marriage on the income-earning abilities of the parties, such as contributions by either party to the education or training of the other party, or foregoing by either party of employment or education; or (4) conduct by either party that lessened the value of marital property. W.Va.Code § 48-2-32(c) (1986).

In the case now before us, the appellee contends that the circuit court was correct in distributing the value of the marital stock rather than the actual stock itself as the appellant argues would be the more equitable method of distribution. The appellee's rationale in support of this contention is that the appellee claims that he was solely responsible for the increase in the value of the stock; and therefore, because it was his contributions that caused the increase, the circuit court's manner of distribution was proper pursuant to the guidelines set forth in *W.Va. Code,* 48-2-32(c)(1-4) [1984].

The family law master found that the appellee made contributions, from 1983, to present as president, chairman and CEO of Ormet, which increased the value of the marital stock. For example, the family law master found that the appellee entered into certain negotiations and agreements which led to reduced production costs and increased profits. However, what the family law master failed to emphasize is the impact the increase in the price of aluminum had on the increase in the value of the stock. The family law master relied upon the testimony of Mr. Wayne Smith, the vice-president of Ormet, who testified that the appellee was instrumental in the success of Ormet. Yet, the family law master failed to note that Mr. Smith also testified that the price of aluminum has a great effect on the success of a company such as Ormet. Furthermore, even the appellee testified as to the direct influence the price of aluminum can have on the effect of the company's earnings. He further admitted that the price of aluminum is something which he cannot control.

Notwithstanding that fact, the appellee argues that this increase in stock, due to his benefaction, took place following the parties' separation and therefore should be considered his separate property pursuant to *W.Va. Code*, 48–2–1(f)(5) [1992], which states: " 'Separate property' means: (5) Property acquired by a party during a marriage but after the separation of the parties and before the granting of a divorce, annulment or decree of separate maintenance[.]"

■ The crux of the appellee's argument centers on the value of the stock, the subsequent increase of the value of the stock and the distribution of the same. Though, in their briefs, the parties quarrel as to the valuation of the stock, the real issue as articulated in oral argument by counsel for the appellant is why the appellant did not receive half of the stock. There was an abundance of testimony and evidence submitted on the issue of the "valuation" of the stock. As generally known, the valuation of a closely held corporation is harder to assess in light of the fact that such stock is not publicly traded. *See Tankersley v. Tankersley*, 182 W.Va. 627, 390 S.E.2d 826 (1990). Thus, due to the difficulty in valuing the stock of a closely held corporation and the fact that West Virginia is an equitable distribution jurisdiction, under the circumstances of this case, we are of the opinion that the circuit court erred in following the family law master's recommendation and focusing on the distribution of the value of the stock rather than the stock itself. *See W.Va. Code*, 48A–4–20(c) [1993].

The appellee argues that it would be unfair to divide the number of shares equally between the parties because it would give the appellant an unjustified windfall in light of the facts relevant to *W.Va. Code*, 48–2–32(c)(1–4) [1984]. Particularly, the appellee argues that his non-monetary contributions which led to the success achieved by Ormet entitle him to a greater portion of the stock.

The appellant argues that the stock was and is marital property in that it is property acquired during the marriage and based upon the statutory presumption, it should be divided equally between the parties. Pursuant to *W.Va. Code*, 48–2–1(e)(1) [1992], marital property is defined as:

All property and earnings acquired by either spouse during a marriage, including every valuable right and interest, corporeal or incorporeal, tangible or intangible, real or personal, regardless of the form of ownership, whether legal or beneficial, whether individually held, held in trust by a third party, or whether held by the parties to the marriage in some form of co-ownership[.]

Therefore, according to the principles set forth above, the stock is obviously marital property.

The appellant argues that value can become a pertinent issue when one spouse is to buy out another spouse's interest in a closely held corporation. *See Bettinger v. Bettinger*, 183 W.Va. 528, 396 S.E.2d 709 (1990). But, as the appellant maintains, the appellee is not now in a position to purchase the stock from the appellant.

The fact that the property increased in value is irrelevant. The actual distribution should be of the stock itself. *See W.Va. Code*, 48–2–32(a) [1984] ("[U]pon every judgment of … divorce …, the court shall divide the marital property of the parties equally between the parties."); *Kapfer v. Kapfer*, 187 W.Va. 396, 419 S.E.2d 464 (1992). Moreover, the evidence is conflicting as to what effect the appellee had on the actual increase in the value of the stock. Though he may have had some influence, there are obviously multiple variables that must be taken into consideration when arriving at such a conclusion.

■ This Court has consistently held, as stated in syllabus point 1 of *Koppel v. Koppel*, 182 W.Va. 492, 388 S.E.2d 848 (1989):

'In a divorce suit the finding of fact of a trial chancellor based on conflicting evidence will not be disturbed on appeal unless it is clearly wrong or against the preponderance of the evidence.' Syl.Pt. 1, *Sandusky v. Sandusky*, 166 W.Va. 383, 271 S.E.2d 434 (1981); Syl.Pt. 4, *Belcher v. Belcher*, 151 W.Va. 274, 151 S.E.2d 635 (1966), *quoting*, Syl.Pt. 3, *Taylor v. Taylor*, 128 W.Va. 198, 36 S.E.2d 601 (1945).

We do not feel that there is sufficient evidence to rebut the statutory presumption of anything but an equal distribution of the stock. We find that the circuit court abused its discretion by failing to award the appellant one-half of the marital stock. Under the circumstances, we find that it is only fair that the appellant receive her statutory share or one-half of the marital stock equalling 120,-967.5 shares of stock.[5]

 The second and final issue before us is whether the appellant is entitled to payment for the remaining one-half of her outstanding attorney's fees. The family law master found the appellant's attorney's fees totalled $110,186.55. The appellant contends that payment of her outstanding attorney's fees by the appellee would be proper because the appellee's income is considerably higher than the appellant's income. The record reflects the fact that since June of 1988, until the end of 1989, the appellant initially worked part time and later full time at a starting wage of $3.54 an hour and by the time she quit, her wages increased to $7.34 an hour. The appellant was expected to start a new job in November of 1991. To the contrary, the appellee's post-separation income was $472,460 for 1990, and $434,415 for 1991. The appellee contends that the appellant has been more than adequately provided for in terms of being able to pay this part of the attorney's fees; however, we find that this argument is without merit. We agree with the appellant.

In syllabus point 14 of *Bettinger, supra*, we recognized, "[t]he purpose of W.Va. Code, 48-2-13(a)(4) (1986), is to enable a spouse who does not have financial resources to obtain reimbursement for costs and attorney's fees during the course of the litigation."

As the appellant correctly points out, the stock award she received is virtually an illusory award in terms of its monetary value.

The stock is not a liquid asset at this time, it cannot be easily converted into cash. The appellant is basically at the mercy of the appellee in terms of any chance that the stock may be redeemed or purchased in the future. Furthermore, the other financial awards received by the appellant are either hampered with tax penalties as she claims,[6] or do not offer the financial assistance she needs to satisfy this debt.

Therefore, based upon the appellant's lack of adequate financial resources to cover her attorney's fees, we are of the opinion that the appellant is entitled to receive from the appellee payment for the remaining one-half of her unpaid attorney's fees.[7]

Under the foregoing principles, we reverse the judgment of the Circuit Court of Ohio County.

Reversed.

---

5. It is important to reiterate that throughout the parties' marriage the evidence suggests that the appellant was a supportive wife and a dutiful mother in that she stayed at home in order to raise the parties' four children.

6. As mentioned in the beginning of this text, the appellant was awarded one-half of the $135,000 IRA rollover pension account; however, if this

account were to be cashed at this time, the appellant points out that a 10% tax penalty would be imposed.

7. The appellant raises several other assignments of error. However, in light of our resolution of the first issue, it is not necessary for us to address the remaining assignments of error.